JUDGE DANIELS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x

UNITED STATES OF AMERICA       :

-v-                            :   FELONY INFORMATION

CHANDLER S. MOISEN,            :   06 CRIM. 1177
also known as "Stuart Moisen,"     06 Cr. ___ (___)

                               :
            Defendant.
                               :

------------------------------------x

DEC 2 1 2006

**COUNT ONE**
(The Tax Fraud Conspiracy)

The United States Attorney charges:

**The Defendant And His Entities**

1.      At various times relevant to this Information, CHANDLER S. MOISEN, also known as "Stuart Moisen" (hereinafter "CHANDLER S. MOISEN" or "MOISEN"), the defendant, was a resident of Colorado and southern California. Prior to residing in Colorado and California, MOISEN was a resident of Saipan, which is part of the Commonwealth of the Northern Mariana Islands ("CNMI"), a commonwealth of the United States. Although generally governed by United States law, CNMI has its own tax authority and code, the provisions of which generally mirror those contained in the Internal Revenue Code.

2.      From in or about 1993 until in or about 2002, CHANDLER S. MOISEN, the defendant, owned, controlled, or was affiliated with a number of corporate or other entities including, among others: Redres Capital Group, Inc.; Skandia; Skandia Capital

Group; WS Acquisitions, Inc.; Petavest; Orinda; ASM Securities; MSA Securities; and Newport Securities.

## Statutory Allegations

3. From in or about 1993 until in or about 2002, in the Southern District of New York and elsewhere, CHANDLER S. MOISEN, the defendant, together with others known and unknown, including Domenick DeGiorgio, an employee of the New York branch of German financial institution Bayerische Hypo -und Vereinsbank ("HVB"); a certified public accountant and attorney from Denver, Colorado, who was a tax partner at KPMG until August 31, 1997 (hereinafter the "Denver accountant") and thereafter the owner of a group of entities based in Denver and San Francisco, through which entities he and others devised and implemented various tax shelter transactions; and an individual located in Saipan (hereinafter "the Saipan co-conspirator") who was an employee and senior officer of a corporation located in Saipan ("the Saipan Entity"), co-conspirators not named as defendants herein, unlawfully, wilfully and knowingly did combine, conspire, confederate and agree to defraud the United States and an agency thereof, to wit, the Internal Revenue Service ("IRS") of the United States Department of Treasury, and to commit offenses against the United States, to wit, violations of Title 26, United States Code, Sections 7201 and 7206(1), and Title 18, United States Code, Section 1343.

## Objects of the Conspiracy

4. It was a part and object of the conspiracy that, during the period from

in or about 1993 through in or about 2002, CHANDLER S. MOISEN, the defendant, together with others, unlawfully, wilfully, and knowingly would and did defraud the United States of America and an agency thereof, to wit, the IRS, by impeding, impairing, defeating, and obstructing the lawful governmental functions of the IRS in the ascertainment, evaluation, assessment, and collection of income taxes.

5.  It was a further part and object of the conspiracy that, during the period from in or about 1993 through in or about 2002, CHANDLER S. MOISEN, the defendant, together with others, unlawfully, willfully, and knowingly, would and did attempt to evade and defeat a substantial part of the income taxes due and owing by various United States taxpayers who participated in, or assisted in devising and implementing, certain tax shelter transactions, in violation of Title 26, United States Code, Section 7201.

6.  It was further an object of the conspiracy that, during the period 1993 through in or about 2002, CHANDLER S. MOISEN, the defendant, together with others, unlawfully, wilfully, and knowingly would and did cause certain United States taxpayers who participated in, or assisted in devising and implementing, tax shelter transactions, to make and subscribe United States individual, corporation, and partnership tax returns for the years 1993 through 2001, which returns contained and were verified by written declarations that they were made under the penalties of perjury, and which MOISEN and the others did not believe to be true and correct as to every material matter, in violation of Title 26, United States Code, Section 7206(1).

7.  It was further an object of the conspiracy that, during the period 1996 through in or about 2002, CHANDLER S. MOISEN, the defendant, together with Domenick DeGiorgio and others, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, to wit, a scheme to defraud HVB by unlawfully converting, and taking by fraud, certain funds under the care, custody, and control of HVB, which funds were under the care, custody, and control of HVB as a result of tax shelter transactions promoted and implemented by HVB and others, would and did transmit and caused to be transmitted, by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343; and

8.  It was further an object of the conspiracy that, during the period 1993 through in or about 2002, CHANDLER S. MOISEN, the defendant, together with the Denver accountant, the Saipan co-conspirator, and others, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, to wit, a scheme to defraud the tax authorities of the CNMI out of income taxes due and owing to the CNMI by (i) the Saipan co-conspirator as a result of fee income received by the Saipan co-conspirator from tax shelter transactions, and (ii) the Saipan Entity

as a result of its entry into the fraudulent ZENS tax shelter transaction and certain other tax shelter transactions, would and did transmit and caused to be transmitted, by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

## Means and Methods of The Conspiracy

9. Among the means and methods used by CHANDLER S. MOISEN, the defendant, and his co-conspirators, to achieve the objects of the conspiracy were the following:

## The Fraudulent Tax Shelter Transactions

10. Between 1993 and 2002, CHANDLER S. MOISEN, the defendant, together with others, caused various entities he and others controlled to participate with United States and CNMI taxpayers in certain tax shelter transactions that MOISEN and others knew were fraudulent. The tax shelter transactions were fraudulent because, as MOISEN and the others well knew and understood, they:

    a. were based on false and misleading statements and representations made and caused to be made by the defendant MOISEN, his co-conspirators, the other tax shelter promoters, and the other participants in the tax shelter transactions, including false and misleading descriptions of the tax shelter transactions contained in the written documents relating to the transactions and the opinion letters issued in connection with the transactions;

false and misleading entries made in the books of the financial institutions providing purported financing relating to certain aspects of the transactions; and false and fraudulent losses being claimed on the tax returns filed with the IRS and other taxing authorities, including the taxing authorities in the CNMI, by participants in the transactions;

    b. employed nominee, or "puppet," non-resident alien individuals ("NRAs"), including NRAs from the Philippines and Norway, who were inserted into the tax shelter transactions by MOISEN, the Denver accountant, DeGiorgio, the Saipan co-conspirator and others because their NRA status would not subject them to United States tax and because off-shore financial transactions and bank accounts involving these individuals would make detection and analysis of the underlying tax shelter transactions more difficult; and

    c. employed nominee, or "puppet," entities, including entities known as "Skandia" and "Somer Leasing LLC," which, although owned and/or managed nominally by NRAs or other third parties, were created, controlled and/or owned, in fact, by the defendant MOISEN, the Denver accountant, and others.

    11. Among the fraudulent tax shelter transactions that the defendant MOISEN and his co-conspirators devised and/or implemented were: a Zero Enhanced Note Structure ("ZENS") transaction carried out by the Saipan Entity, which involved purported financing provided by a major financial institution located in New York, New York; certain "357(c)" transactions involving NRAs and purported financing provided by a major New

York financial institution; and certain "MIDCO" tax shelter transactions, which involved NRAs and purported financing provided by a major New York financial institution.

### The Fee-Splitting Agreements

12. As a result of his promotion and implementation of various tax shelter transactions between 1993 and 2001, including the fraudulent tax shelter transactions referred to in the preceding paragraph, CHANDLER S. MOISEN, the defendant, and his co-conspirators generated millions of dollars of fee income, which income was generally paid by the entities and individuals participating in the transactions to MOISEN and his co-conspirators, including the Denver accountant, DeGiorgio, and the Saipan co-conspirator, as well as other promoters of the transactions.

13. In order to disburse to the defendant MOISEN and his co-conspirators their portions of the tax shelter fee income in a manner that would allow the recipients of that income to hide the income from the IRS and other taxing authorities, including the tax authorities in the CNMI, MOISEN and his co-conspirators employed a number of elaborate and stealthy means. Those means included:

    a. causing the payment of the fee income to DeGiorgio, the Denver accountant, and the Saipan co-conspirator to be hidden from HVB (the employer of DeGiorgio), the Saipan Entity (the employer of the Saipan co-conspirator), and KPMG (the partnership of which the Denver accountant was a partner until August 31, 1997);

    b. causing millions of dollars of fee income to be sent from bank accounts

in the United States to bank accounts in Manila, Philippines (the "Philippines bank accounts"), and controlled by an NRA located there, who, in exchange for certain payments, agreed to receive the fees in the Philippines bank accounts and thereafter send the fees back to the defendant MOISEN and his co-conspirators (or third parties designated by MOISEN and his co-conspirators) in the United States and Saipan upon receipt of instructions regarding how the funds should be disbursed;

   c. causing millions of dollars of fees to be sent to the bank accounts of an attorney located in Denver, Colorado, and an NRA from Oslo, Norway, both of whom assisted MOISEN and his co-conspirators in the promotion and implementation of the fraudulent tax shelter transactions and the disbursement of the fees to MOISEN and the others;

   d. causing checks and demand drafts to be drawn on the Philippines bank accounts to be made payable to individuals and entities designated by MOISEN, DeGiorgio, the Denver accountant, and the Saipan co-conspirator, which checks and drafts MOISEN, DeGiorgio, the Denver accountant, and the Saipan co-conspirator used to acquire assets, pay personal debts, and make gifts; and

   e. causing wire transfers to be made from the Philippines bank accounts to individuals and entities designated by MOISEN and his co-conspirators, which MOISEN, DeGiorgio, the Denver accountant, and the Saipan co-conspirator used to acquire assets, pay personal debts, and make gifts.

## Overt Acts

14. The following overt acts, among others, were committed, and caused to be committed, in the Southern District of New York and elsewhere, by CHANDLER S. MOISEN, the defendant, and his co-conspirators in furtherance of the conspiracy and to effect its objects:

a. On or about January 10, 1995, the Denver accountant sent a facsimile from Denver, Colorado, to MOISEN and the Saipan co-conspirator. In the letter, the Denver accountant proposed "how profits should be divided, bonuses paid and advances recouped" based on the implementation of certain tax shelter transactions by MOISEN, the Denver accountant, and others.

b. From in or about August 1995 through December 1995, MOISEN, together with the Denver accountant and others, devised and implemented, through the use of "Skandia" and a bank located in New York, New York, a tax shelter transaction relating to the sale, by a client of KPMG, of a building located in San Francisco.

c. On or about February 1, 1996, the Denver accountant sent a letter via fax from the KPMG offices in Denver, Colorado, to MOISEN and a co-conspirator located in Norway, in which the Denver accountant, among other things, (i) stated that he had "enclosed what I [the Denver accountant] believe is our Skandia arrangement for 1996"; (ii) stated that, "I believe we need to run this enterprise [Skandia] like a real business for the next twelve months"; (iii) discussed how $150,000 would be distributed, "at the Skandia level,"

among each of the three members of Skandia LLC, declaring, "What a 'gift' this is to us all!"; (iv) proposed how expenses should be paid, and profits distributed, from certain tax shelter transactions; (v) proposed responsibilities for MOISEN, the Denver accountant, and the Norwegian for generating tax shelter transactions in1996, with the Denver accountant's self-described responsibility being to "[w]ork the KPMG systems for leads and details"; (vi) requested that MOISEN and the Norwegian respond to the faxed letter after they had had a chance to review it; and (vii) stated that he (the Denver accountant) "would prefer that you [MOISEN and the Norwegian] use [the Denver accountant's] home address for correspondence."

  d. On or about February 12, 1996, at the request of the Denver accountant, an NRA located in Manila, Philippines, caused a cashier's check in the amount of $5,000 and payable to a real estate concern in Colorado be drawn on a Philippines bank account and sent to the Denver accountant in Denver, which check the Denver accountant used to make a deposit on the purchase of a second home located in Breckenridge, Colorado.

  e. On or about March 13, 1996, a co-conspirator located in Norway sent a facsimile to the New York, New York, branch of HVB directing a wire transfer in the amount of $228,000 to be sent from a New York-based HVB account of Skandia Capital Group Limited to an account located in Manila, Philippines.

  f. On or about July 29, 1996, pursuant to instructions provided by the Denver accountant, an NRA located in Manila, Philippines, caused cashier's checks in the

amount of $11,121 and $83,982 to be drawn on a Philippines bank account and sent to the Denver accountant in Colorado, which checks the Denver accountant used to pay for, respectively, the private school tuition of the Denver accountant's eldest son and certain real estate located in Breckenridge, Colorado.

   g. On or about September 3, 1996, MOISEN sent a facsimile from Castle Rock, Colorado, to the Saipan co-conspirator, in which MOISEN (i) advised the Saipan-based co-conspirator that funds totaling $414,000 ("subject to final numbers") were to be made available, in the "next day or two," in a Philippines-based bank account; (ii) requested the Saipan co-conspirator to ask an individual in the Philippines "to take $25,000 for his services rendered"; (iii) requested a series of checks to be sent to MOISEN via DHL courier; (iv) advised that "Bob [the Denver accountant]" will send a fax to the Saipan co-conspirator that will contain the Denver accountant's instructions how funds should be disbursed to the Denver accountant; and (v) advised that a co-conspirator located in Norway, referred to by MOISEN as "the flying Norwegian," will also send a fax containing the Norwegian's request how funds should be disbursed to the Norwegian.

   h. In or about and between September 1996 and December 1996, MOISEN and certain co-conspirators, including the Denver accountant and the Saipan co-conspirator, implemented a ZENS tax shelter transaction for the Saipan Entity, which transaction involved purported financing provided by a bank located in New York, New York, and an opinion letter provided by an attorney at a large national law firm located in New York.

i.      On or about January 10, 1997, an NRA located in the Philippines caused checks in the amounts of $260,000, $17,000, and $15,851 to be drawn on a Philippines bank account and sent to the Denver accountant in Denver, which the Denver accountant used to purchase, respectively, a Breckenridge, Colorado home (held in the name of a corporate entity nominally owned by the Denver accountant's wife), a Porsche Boxster automobile, and interests in mutual funds.

j.      In or about February 1997, Domenick DeGiorgio sent to MOISEN certain personal credit card bills of DeGiorgio together with a handwritten note. In the note, which requested MOISEN to pay the credit card bills, DeGiorgio wrote, "...I want to keep the payments below $10,000, even to the credit card companies – reduce risk of raising red flag. Once this is paid down, I'll write checks to bring the other Visa below the $10K level – perhaps we can take care of that next month – once these cc's are gone, let's agree to a $5K per month. Anything beyond the $5K per month we should keep offshore somewhere, as you & Bob keep suggesting."

k.      On or about December 15, 1997, MOISEN, the Denver accountant, and the Saipan co-conspirator caused fee income in the amount of $3,624,950 to be wire-transferred into a bank account located in the Philippines, which fee income was attributable to a tax shelter transaction that was devised and/or implemented by MOISEN, the Denver accountant, and the Saipan co-conspirator, in which the Saipan Entity was involved.

l.      On or about December 18, 1997, the Denver accountant sent a fax to the

Saipan co-conspirator and an NRA in the Philippines in which the Denver accountant stated, "I am owed $2,156,541" from the tax shelter transaction giving rise to the $3,624,950 fee referred to in overt act "k". In the fax, the Denver accountant requested that $2,124,541 of the funds be disbursed pursuant to wire transfer instructions he provided, including $1,000,000 to the corporate entity, nominally owned by his wife, that was utilized to purchased the Denver accountant's Breckenridge, Colorado, home. The Denver accountant also (i) instructed that three checks, totaling $32,000 and payable to his relatives and his credit card company, be sent to his former secretary at the offices of KPMG in Denver, Colorado; and (ii) noted that "as soon as Stuart [MOISEN] is back we can close out [two other tax shelter] transactions."

   m. Between December 1997 and February 1998, an NRA located in the Philippines caused wire transfers totaling $2,124,541 to be sent from a bank account in the Philippines to bank accounts designated by the Denver accountant in Colorado, which transfers were cleared through Corestates Bank International in New York, New York.

   n. On or about February 11, 1998, MOISEN sent a fax memorandum to an NRA located in the Philippines in which MOISEN explained that approximately $67,000 was about to be wire- transferred to a Philippines bank account.

   o. On or about March 10, 1998, the Denver accountant sent a fax from Denver to an NRA located in the Philippines, which was also cc'd to MOISEN, the Saipan co-conspirator, and DeGiorgio. In the fax, the Denver accountant (i) informed the Philippines

NRA that a New York-based law firm had formed "a Delaware situs limited liability company ('LLC') of which you [the NRA] are the sole member and manager"; (ii) informed the Philippines NRA that the LLC of which the NRA was just then informed he was the sole member and manager [Somer Leasing LLC] had just borrowed $500,000 from a Guam-based corporation; (iii) informed the NRA that the LLC had been tentatively approved by HVB to "borrow $25 million for a 30-year term" in connection with a tax shelter transaction but noted that certain provisions of the loan agreement could result in repayment of the loan within one year; (iv) provided a time-line of events, or steps, of the transaction; and (v) stated that the NRA should be able to receive $50,000 as "manager's compensation" at the end of a certain stage of the transaction.

   p. On or about July 21, 1998, the Denver accountant wire transferred to MOISEN approximately $1,024,000, which represented tax shelter fees that the Denver accountant was sharing with MOISEN and the Saipan co-conspirator.

   q. On or about December 23, 1998, MOISEN and his co-conspirators caused funds in the approximate amount of $1,025,000 to be deposited into a bank account located in the Philippines, which funds represented fee income paid to MOISEN, the Denver accountant, and the Saipan co-conspirator as a result of the completion of a tax shelter transaction entered into by the Saipan Entity.

   r. On or about December 24, 1998, the Denver accountant sent a facsimile from Colorado to an NRA located in the Philippines in which the Denver accountant

instructed that disbursements from the Philippines account be made to him via checks or wire transfers directed to: his mother (in the amount of $116,000); his dentist (in the amount of $11,000); the owner of an Englewood, Colorado, home on which the Denver accountant was making the final payment (in the amount of $500,000) as part of a $1,500,000 purchase price; his credit card company (in the amount of $64,000); and another third party (in the amount of $9,000.00).

  s. On or about December 29, 1998, an NRA located in the Philippines caused a wire transfer in the amount of $200,000 to be sent from the Philippines to an account at the Bank of Hawaii in the name W.S. Acquisition Corp., an entity controlled by MOISEN.

  t. On or about April 5, 1999, the Denver accountant sent a fax from Colorado to an NRA located in the Philippines in which the Denver accountant instructed that, from the $100,000 of fees remaining from $1,025,000 amount deposited in the Philippines account in December, 1998, disbursements from the account should be made to him via checks payable to: his country club (in the amount of $48,000); a music store in Denver ($34,000 for a Steinway Tiffany piano); a home renovation company ($9,000); and a third party ($9,000).

  u. On or about July 6, 1999, the Denver accountant sent a memorandum to the treasurer of a company located in California in which the Denver accountant requested that certain payments due to be made to the Denver accountant's company as the result of the

tax shelter transaction devised and implemented by MOISEN, the Denver accountant, and DeGiorgio, and involving Somer Leasing LLC, be made to MOISEN through MOISEN's company, resulting in twenty payments being made to MOISEN's company between 1999 and 2001.

v. On or about February 15, 2000, the Denver accountant sent a fax to an NRA located in the Philippines in which the Denver accountant requested that $59,521 be transferred by the Philippines NRA "as soon as possible" to a bank in Colorado, for "further credit to Mercedes Benz of Littleton," which funds the Denver accountant used to purchase a Mercedes Benz CLK 430 for his sister.

w. On or about November 1, 2000, the Denver accountant sent a memorandum from Colorado to CHANDLER S. MOISEN in California in which the Denver accountant acknowledged that he had "agreed to give [MOISEN] and [the Saipan co-conspirator] (each) a one-third profits interest" in a tax shelter transaction orchestrated by the Denver accountant.

x. On August 11, 2001, MOISEN sent an e-mail from California to Domenick DeGiorgio in New York, New York. In the e-mail, which was entitled "Us getting rich," MOISEN stated, "Dom, one of my recurring nightmares involves you/me and our receipt of $. The first used to be that somehow the bank would catch you and we would all go to jail because we were violating federal banking laws. That concern of course was started by Bob and has largely dissipated. The second nightmare is that the IRS catches on and

you/we are nailed for income tax evasion. People go to jail for that one." MOISEN then suggested that a "better system" be figured out, expressed a hope that DeGiorgio had given "some thought about this too," and concluded by observing, "I would hate to see us ring the re[g]ister and then end up in Leavenworth. I would assume the government would not have a lot of mercy, considering that the source of the funds was profits from tax shelters."

  y. On or about October 9, 2001, MOISEN sent an e-mail from southern California to the Saipan co-conspirator in which MOISEN wrote, "... Dom and I have a small deal closing and I am trying to remember how much we paid [the NRA located in the Philippines] in the past when we used his services to cut checks."

  z. On or about October 9, 2001, the Saipan co-conspirator responded to MOISEN's e-mail of earlier that day by stating, in an e-mail sent to MOISEN, "Stu we have paid [the NRA located in the Philippines] from 10,000 to 25,000 depending on the size ...."

  aa. On October 12, 2001, MOISEN sent an e-mail to Domenick Degiorgio in New York relating to the HVB-based bank account of an entity that had been employed by MOISEN, DeGiorgio, and the Denver accountant in a tax shelter transaction. In the e-mail, MOISEN wrote, "Dom, how will we deal with the $ in your absence? I hate to see that account earn any interest. I think for future funds we do it thru [the entity] thru [the NRA located in the Philippines]. Pretty clean way to get it out of the country and our names are not associated with the accounts."

  bb. On or about October 13, 2001, Domenick DeGiorgio responded to

MOISEN's e-mail of the previous day, writing, "Let's leave the money there for a week. I'll get the cash out as soon as I return. I also agree with your strategy. Clean is better. By the way, no more e-mails like this ok?"

cc. On or about October 31, 2001, MOISEN caused four cashier's checks in various amounts totaling $92,000 to be drawn on a bank account located in the Philippines and thereafter sent to him in Laguna Beach, California.

(Title 18, United States Code, Section 371.)

### COUNT TWO
(Wire Fraud Affecting A Financial Institution)

The United States Attorney further charges:

15. The allegations set forth in Paragraphs 1-2 and 9-14 of this Information are repeated, realleged, and incorporated by reference as though fully set forth herein.

### Statutory Allegations

16. On or about and between 1996 and 2002, in the Southern District of New York and elsewhere, CHANDLER S. MOISEN, together with others, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted, by means of wire communications in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, MOISEN sent and caused to be sent certain interstate and international faxes and wire transfers (i) to New York, New York, from California, Colorado,

Saipan, and the Philippines; and (ii) from New York, New York, to California, Colorado, Saipan, Australia, and the Philippines.

### Mechanics Of The Scheme To Defraud

17.   As a result of HVB's participation in certain tax shelter transactions, HVB came into custody and control of various funds that were received and disbursed through accounts under the control of HVB's Financial Engineering Unit, of which Domenick DeGiorgio was the head between 1996 and 2002. During that period of time, DeGiorgio, with the assistance of CHANDLER S. MOISEN, the defendant, took by fraud, and converted to his own use, certain funds under the care, custody, and control of HVB, which funds had been transferred to HVB in connection with tax shelter transactions. DeGiorgio, with the help of MOISEN, carried out the fraud scheme by causing tax shelter participants to make certain transfers to HVB bank accounts, and thereafter causing hundreds of thousands of dollars of funds to be unlawfully diverted from those HVB bank accounts in New York, New York, to pay various personal creditors of DeGiorgio and MOISEN.

(Title 18, United States Code, Section 1343.)

_____
MICHAEL J. GARCIA
United States Attorney

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

- v -

CHANDLER S. MOISEN,
also known as "Stuart Moisen,"

Defendant.

---

**INFORMATION**
06 Cr.

---

MICHAEL J. GARCIA
United States Attorney for  USA
(212) 637-1585